UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                      :

JAY SCHIFF,                          :

                        :       19cv4735

                  Plaintiff,        :

                        :      <u>MEMORANDUM & ORDER</u>

        -against-         :

                        :

ZM EQUITY PARTNERS, LLC, *et al*.,    :

                        :

             Defendants.     :

                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, Senior United States District Judge:

           Defendants ZM Equity Partners, LLC ("ZM Equity" or "ZM"), Centre Lane

Partners, LLC ("CLP"), Quinn Morgan, and 10th Lane Partners, LP ("10th Lane Partners")

(together, "Defendants") move to dismiss the Amended Complaint pursuant to Federal Rule of

Civil Procedure 12(b)(6).  Invoking diversity jurisdiction, Plaintiff Jay Schiff asserts claims for

breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious

interference.  He also seeks two declaratory judgments against Defendants.  Finally, Schiff

moves to amend his Amended Complaint.  For the reasons that follow, Defendants' motion is

granted in part and denied in part.  As to Schiff's motion to amend, the parties are directed to file

supplemental briefing.

<u>BACKGROUND</u>

I.      <u>The Parties</u>

           Until its dissolution in 2016, ZM Equity was a private equity firm operating as a

Delaware limited liability company ("LLC").  (Am. Verified Compl., ECF No. 47 ("AC"), ¶¶ 20,

31; AC, Ex. 6 ("Certificate of Cancellation").)  Schiff alleges Morgan managed ZM Equity and

that Morgan and his wife were its sole members.  (AC ¶ 20.)  Morgan is a Florida citizen.[1]  (See AC ¶ 23.)

CLP is a Delaware limited liability company, which Schiff claims is the alter ego of ZM Equity.  (AC ¶ 21.)  10th Lane Partners is a Delaware limited partnership ("LP"), the sole member of CLP, and the alleged successor of ZM Equity.[2]  (AC ¶ 22.)  The general partner of 10th Lane Partners is Q&U Investments LLC, whose sole member is Morgan.  (AC ¶¶ 21–22.)  Morgan and his wife are also limited partners of 10th Lane Partners.  (AC ¶¶ 21–22.)

II.     The Employment Agreement, LLC Agreement, and Confidentiality Agreement

On February 26, 2009, Schiff signed an employment agreement with ZM Equity.  (AC ¶ 2; AC, Ex. 1 ("Employment Agreement"), at 1.)  The Employment Agreement named Schiff Co-President of non-party 10th Lane Finance Co., LLC ("10th Lane Finance"), an investment vehicle formed to acquire and manage investments on behalf of its investors.  (AC ¶¶ 3, 37; Employment Agreement, at 1.)  10th Lane Finance's managing member is 10th Lane Partners.  (AC ¶ 3.)  It operates as a Delaware LLC and is governed by an Amended and Restated Limited Liability Company Agreement.  (AC ¶ 3; AC, Ex. 3 (the "LLC Agreement").)

In addition to setting his salary and bonus, Schiff's Employment Agreement with ZM Equity included an incentive compensation plan.  (AC ¶ 5; Employment Agreement, at 1–2.)  Under that plan, Schiff was "entitled to receive 20% of the incentive compensation received by" 10th Lane Partners, the managing member of 10th Lane Finance.  (Employment Agreement, at 2.)

---

[1]     On September 18, 2019, this Court denied Schiff's motion to remand this action to the New York State Supreme Court.  (ECF No. 36.)  In its findings, this Court determined that Schiff was a New York citizen and Morgan was a Florida citizen when the Complaint was filed.  (Tr. of Pre-Motion Conference on September 18, 2019, ECF No. 40, at 8–11.)

[2]     10th Lane Partners formerly operated as an LLC but converted to LP status in 2016.  (AC ¶ 22.)

The payment of any incentive compensation vested at 20% per year on the anniversary of Schiff's start date.  (Employment Agreement, at 2.)

From March 2009 until February 2015, Schiff was Co-President (and then President) of 10th Lane Finance.  (AC ¶ 5.)  When Schiff left that position in February 2015, his incentive plan was fully vested, entitling him to 20% of the incentive compensation received by 10th Lane Partners.  (AC ¶ 5.)  Schiff seeks to recover that incentive compensation.

In broad strokes, Schiff argues that Defendants mismanaged 10th Lane Finance. Specifically, Schiff claims that Defendants should have sold or wound down 10th Lane Finance's investment assets by the end of the "Investment Period" in June 2015.  (AC ¶¶ 6, 54–62.)  If Defendants had complied with that deadline, then 10th Lane Partners would have received over $5 million in incentive compensation, entitling Schiff to approximately $1 million.  (AC ¶ 6.) However, Schiff alleges Defendants made unauthorized investments after termination of the Investment Period that led to a decline in the value of the investment assets.  (AC ¶¶ 8, 64–70.) And when Defendants sold those assets in April 2017, they did so at a discount to an entity controlled by Morgan.  (AC ¶¶ 9, 65–66.)  Additional delays, combined with payments for excessive professional fees, caused the value of Schiff's incentive compensation payment to decline further.  (AC ¶¶ 10, 67–70.)

After Schiff threatened litigation, Defendants offered him approximately $150,000, provided that he release them from any legal claims.  (AC ¶¶ 12, 85.)  Schiff refused and filed this lawsuit.  He alleges breaches of the Employment Agreement and LLC Agreement, as well as breaches of their implied covenants of good faith and fair dealing and tortious interference with those contracts.  Schiff also seeks two declaratory judgments: one releasing him from his Confidentiality Agreement so that he can tout his accomplishments to potential

3

employers, (AC ¶ 143; AC, Ex. 2 ("Confidentiality Agreement")); and another finding that CLP is the alter ego of ZM Equity, (AC ¶¶ 148–162).

Finally, Schiff moves to amend his Amended Complaint to: (1) assert the second cause of action against Morgan, in addition to 10th Lane Partners; (2) assert the third cause of action against CLP, in addition to Morgan and 10th Lane Partners; and (3) in the event that his second cause of action is deemed derivative, to add an allegation of demand futility.  (ECF No. 53.)

DISCUSSION

I.     Legal Standard

On a motion to dismiss, a court accepts all facts alleged in the complaint as true and construes all reasonable inferences in a plaintiff's favor.  ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  Nevertheless, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted).  To survive a motion to dismiss, the court must find the claim rests on factual allegations that "raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." (quotation marks omitted)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  And on a Rule 12(b)(6) motion, "consideration is limited to facts stated on the face of the complaint, in documents appended to

the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Allen v. WestPoint–Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

II.     Employment Agreement

    a.     Parties to the Contract

Schiff alleges that ZM Equity, CLP, and 10th Lane Partners breached the Employment Agreement and its implied covenant of good faith and fair dealing. (See AC ¶¶ 93–122.) "It is hornbook law that a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." Mazzei v. Money Store, 308 F.R.D. 92, 109 (S.D.N.Y. 2015) (quotation marks omitted). Defendants do not dispute that ZM Equity was a party to the Employment Agreement, but argue that it lacks the capacity to be sued because it was formally dissolved in 2016. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss Am. Verified Compl., ECF No. 52 ("Defs.' Mem."), at 3–4.) Nevertheless, Defendants concede that 10th Lane Partners is the "successor in interest" to ZM Equity and a proper defendant. (Defs.' Mem., at 1.) The parties also spar over CLP's status and whether it may be held liable as ZM Equity's "alter ego."

Although New York law applies to Schiff's contractual claims,[3] Delaware law governs ZM Equity's capacity to be sued because the company was organized pursuant to Delaware law. See Fed. R. Civ. P. 17(b)(3); N.Y. LLC Law § 801(a); see also Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC, 2019 WL 1244294, at *11 (S.D.N.Y. Mar. 18,

---

[3]     Because the Amended Complaint invokes diversity jurisdiction, New York's choice of law rules apply. See 28 U.S.C. § 1652; Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). "New York courts typically enforce a choice-of-law clause in a contract when the chosen law has a 'reasonable relationship' to the contract and does not violate New York public policy." Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 408 (S.D.N.Y. 2010). Here, Schiff's Employment Agreement provides that it shall be governed by New York law. (AC ¶ 26; Employment Agreement, at 3.) Additionally, the parties themselves rely on New York law in their briefing. See, e.g., Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000). Accordingly, this Court applies New York law.

2019).  Under Delaware law, the legal existence of an LLC continues until "cancellation of the limited liability company's certificate of formation."  6 Del. C. § 18-201(b).  To cancel a LLC's certificate of formation, a certificate of cancellation is filed in the office of the Delaware Secretary of State "upon the dissolution and the completion of winding up of [the LLC] . . . ."  6 Del. C. § 18-203(a).  Once that filing occurs, a dissolved LLC lacks the capacity to sue or be sued.  See 6 Del. C. § 18-803(b); see also Lyman Commerce Sols., Inc. v. Lung, 2013 WL 4734898, at *5 (S.D.N. Y Aug. 30, 2013).  There is, however, an exception to this rule: A party may attempt to nullify a dissolved LLC's certificate of cancellation by alleging that the LLC was "wound up in contravention of the [Delaware] LLC Act."  Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc., 854 A.2d 121, 139 (Del. Ch. 2004).

Here, ZM Equity was formally dissolved in 2016 and a certificate of cancellation was filed with the Delaware Secretary of State on December 30, 2016.  (AC ¶ 20; Certificate of Cancellation.)  Therefore, because Schiff filed this action in New York State Supreme Court in March 2019—over two years after the certificate of cancellation was filed—ZM Equity cannot be subject to suit.  See Metro Commc'n, 854 A.2d at 138 ("18-803(b) of the LLC Act provides that suit generally may be brought by or against a limited liability company only until the certificate of cancellation is filed."); accord Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 520 (S.D.N.Y. 2012).

Moreover, Schiff's attempt to rely on the exception under Delaware law is unavailing.  He claims that ZM Equity was wound up and terminated in contravention of the Delaware LLC Act.  (AC ¶ 20.)  But boilerplate aside, the Amended Complaint is devoid of any factual allegations supporting this inference.  See Iqbal, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."

(quotation marks omitted)).  Therefore, all claims against ZM Equity are dismissed.

Although ZM Equity is not subject to liability, Schiff attempts to pierce the corporate veil and hold CLP liable as the "alter ego" of ZM Equity.  "New York law permits a plaintiff to 'pierce the corporate veil' and sue a non-signatory for breach of contract when the non-party is an alter ego of one or more signatories."  Mirage Entm't, Inc. v. FEG Entretenimientos S.A., 326 F. Supp. 3d 26, 34 (S.D.N.Y. 2018).  "[A] court may pierce the corporate veil where (i) the owner exercised complete domination over the corporation with respect to the transaction at issue, and (ii) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  Boroditskiy v. European Specialties LLC, 314 F. Supp. 3d 487, 494 (S.D.N.Y. 2018) (quotation marks omitted).

"[W]hether the alleged alter-ego entity exercised complete domination . . . is highly case-specific and [depends on] . . . the totality of the facts."  LiquidX Inc. v. Brooklawn Capital, LLC, 254 F. Supp. 3d 609, 617 (S.D.N.Y. 2017) (quotation marks omitted).  Although Schiff likely alleges sufficient facts to indicate CLP's "complete domination" of ZM Equity at this stage, (see AC ¶¶ 148–55), he fails to satisfy the fraud prong.  Specifically, Schiff does not allege that CLP's domination "abused the privilege of doing business in the corporate form." Morris v. N.Y. State Dep't of Taxation & Fin., 623 N.E.2d 1157, 1161 (N.Y. 1993). "[D]omination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the] plaintiff is required."  Morris, 623 N.E.2d at 1161.  Critically, the wrongful or unjust act "must consist of more than merely the . . . breach of contract that is the basis of the [party's] lawsuit."  Tradewinds Airlines, Inc. v. Soros, 2012 WL 983575, at *6 (S.D.N.Y. Mar. 22, 2012) (quoting NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 183 (2d Cir. 2008)).

Schiff conflates CLP and Morgan's actions throughout the Amended Complaint.

Specifically, Schiff alleges that Morgan "used his domination and control of both [CLP] and ZM Equity to <u>defraud</u> [him] and deny him [his] incentive compensation."  (AC ¶ 156 (emphasis added).)  But where a veil-piercing claim rests on allegations of fraud, the heightened pleading standard of Rule 9(b) applies.  <u>In re Currency Conversion Fee Antitrust Litig.</u>, 265 F. Supp. 2d 385, 425–26 (S.D.N.Y. 2003).  Schiff's conclusory allegations of fraud—without more—are insufficient to state a claim.  <u>See, e.g.</u>, <u>EED Holdings v. Palmer Johnson Acquisition Corp.</u>, 228 F.R.D. 508, 512 (S.D.N.Y. 2005).  Moreover, although it is not strictly necessary to find that the transaction "constituted 'fraud'" on the aggrieved party, <u>Gorrill v. Icelandair/Flugleidir</u>, 761 F.2d 847, 853 (2d Cir. 1985), Schiff's supplementary allegations of wrongdoing are inadequate because they duplicate his breach of contract claim, <u>see</u> <u>Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.</u>, 270 F. Supp. 3d 716, 732 (S.D.N.Y. 2017) ("[I]t is well-established that an ordinary breach of contract, without evidence of fraud or corporate misconduct, is not sufficient to pierce the corporate veil." (quotation marks omitted)).

While Schiff pleads that Morgan engaged in self-dealing with an entity he controlled, he fails to tether those allegations to any wrongful conduct by CLP.  <u>See</u> <u>Giordano v. Thomson</u>, 438 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) ("For a plaintiff's allegations to be sufficient, plaintiff must establish a causal relationship—that the injustice to plaintiff resulted [from] the misuse of the corporate form.").  Lacking allegations of an abuse of the corporate form or other fraudulent conduct, Schiff cannot carry the heavy burden required to apply the veil piercing/alter ego theory.  <u>Mirage Entm't</u>, 326 F. Supp. 3d at 35.  Therefore, CLP cannot be considered ZM Equity's alter ego.  Accordingly, Schiff's claims for declaratory relief in the fifth cause of action is dismissed as to CLP.

b.  <u>Breach of Contract</u>

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." <u>Orlander v. Staples, Inc.</u>, 802 F.3d 289, 294 (2d Cir. 2015) (quotation marks omitted).  "When interpreting a contract [under New York law], the intention of the parties should control, and the best evidence of intent is the contract itself." <u>Gary Friedrich Enters., LLC v. Marvel Characters, Inc.</u>, 716 F.3d 302, 313 (2d Cir. 2013) (alteration in original) (quotation marks omitted).  The first step in interpreting a contract is to determine whether the language is ambiguous.  <u>Lockheed Martin Corp. v. Retail Holdings, N.V.</u>, 639 F.3d 63, 69 (2d Cir. 2011).  "Ambiguity must be determined on the face of the contract; extrinsic evidence may not be introduced in an attempt to create ambiguity." <u>Charron v. Sallyport Global Holdings, Inc.</u>, 2014 WL 7336463, at *16 (S.D.N.Y. Dec. 24, 2014); <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 566 N.E.2d 639, 642 (N.Y. 1990).  Whether a contract is ambiguous is a legal issue for this Court to decide.  <u>Lockheed Martin</u>, 639 F.3d at 69.

A contract is ambiguous if a "reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." <u>Topps Co., Inc. v. Cadbury Stani S.A.I.C.</u>, 526 F.3d 63, 68 (2d Cir. 2008).  By contrast, a contract is unambiguous if the applicable provisions have "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." <u>JA Apparel Corp. v. Abboud</u>, 568 F.3d 390, 396 (2d Cir. 2009) (alteration in original) (quoting <u>Breed v. Ins. Co. of N. Am.</u>, 385 N.E.2d 1280, 1282–83 (N.Y. 1978)).  At the motion to dismiss stage, a court "should resolve any contractual ambiguities in favor of the plaintiff." <u>Subaru Distribs. Corp. v. Subaru of Am., Inc.</u>, 425 F.3d

119, 122 (2d Cir. 2005).

Schiff seeks damages for breach of contract due to Defendants' alleged failure to pay him incentive compensation under the Employment Agreement.  Schiff avers—and Defendants do not contest—that he performed his obligations under the agreement and his incentive compensation vested when he resigned from 10th Lane Finance.  (AC ¶¶ 96–98.)  And as mentioned, although the Employment Agreement was a binding contract between Schiff and ZM Equity, 10th Lane Partners was ZM Equity's successor and therefore can be held liable.  Thus, the two issues are whether Defendants breached the Employment Agreement by offering Schiff less incentive compensation than he contends he was entitled to and whether Defendants could condition that payment on a release.

"It is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive."  O'Shea v. Bidcom, Inc., 2002 WL 1610942, at *3 (S.D.N.Y. July 22, 2002).  But such discretion will not be implied if no contractual provision gives the employer absolute discretion over compensation.  Fishoff v. Coty Inc., 634 F.3d 647, 653–54 (2d Cir. 2011); O'Shea, 2002 WL 1610942, at *3.  Accordingly, courts look to language that "unambiguously" vest employers with the power to make these awards.  See Smith v. Railworks Corp., 2011 WL 2016293, at *3 (S.D.N.Y. May 17, 2011) ("[A]n employer's absolute discretion to withhold or modify a bonus must be set forth unambiguously."); Namad v. Salomon Inc., 543 N.E.2d 722, 723 (N.Y. 1989) (affirming the dismissal of a claim for a bonus where the agreement "unambiguously vest[ed] discretion regarding the amount of bonus compensation to be awarded in defendants' management").

Here, the Employment Agreement does not unambiguously vest complete discretion in Defendants to determine Schiff's incentive compensation.  The Employment Agreement provides that Schiff  "shall be entitled to receive 20% of the incentive compensation received by" 10th Lane Partners.  (Employment Agreement, at 2 (emphasis added).)  Unlike contractual language vesting total discretion with an employer to award bonuses, Schiff's incentive compensation plan is explicitly conditioned on 10th Lane Partners "receiv[ing] such incentive compensation," a five-year vesting schedule, and Schiff not being terminated for cause.  (Employment Agreement, at 2.)  Therefore, this language may reasonably be read to evidence "the parties' intent to be contractually obligated," O'Shea, 2002 WL 1610942, at *4, and suggests that Defendants cannot withhold all incentive compensation in their sole discretion, see, e.g., Bravia Capital Partners, Inc. v. Fike, 2011 WL 6081345, at *4–5 (S.D.N.Y. Dec. 6, 2011) (finding that phrase "will be entitled to a bonus" did not vest complete discretion in employer); Culver v. Merrill Lynch & Co., Inc., 1995 WL 422203, at *3 (S.D.N.Y. July 17, 1995) (holding that the clause, "[d]istribution of [bonuses] will be determined by the Division Director and Group Manager" lacked the "magic words" unambiguously giving employer absolute discretion to pay bonus).

The parties' contractual intent is further supported by the provision governing Schiff's bonus compensation, which is distinct from his incentive compensation plan.  According to the Employment Agreement, "ZM retains the right to pay bonuses later in the calendar year, or not at all (except in the case of your guaranteed bonus for 2009), within ZM's sole discretion." (Employment Agreement, at 2 (emphasis added).)  This language parallels the unambiguous phrasing in employment agreements that vest employers with the absolute discretion to award bonuses.  See, e.g., Namad, 543 N.E.2d at 723 (no contract where "[t]he amounts of other

11

compensation and entitlements, if any, . . . shall be at the discretion of the management"); see also Cohen v. Avanade, Inc., 874 F. Supp. 2d 315, 321 (S.D.N.Y. 2012) (finding breach of contract claim failed, in part, because compensation plan "unambiguously gives [the employer] discretion to 'interpret and apply the Plan as it deems appropriate,' and expressly states that [the employer] 'reserves the right to modify, suspend or terminate any and all sales compensation plans at its sole and absolute discretion . . .'").

Nonetheless, while Defendants may not have complete discretion to decide whether to pay, they have some.  The Employment Agreement states that "[a]ll computations and determinations in respect of compensation (including incentive compensation) shall be in ZM's sole discretion."  (Employment Agreement, at 2.)  This is the heart of the parties' disagreement: Schiff does not allege that Defendants failed to offer him any incentive compensation.  Rather, he avers that Defendants breached the Employment Agreement because they miscalculated his payment and conditioned that payment on a release.  Defendants counter that Schiff's belief that he was entitled to a larger incentive payment is immaterial since that decision is entirely in ZM's "sole discretion."

While the phrase "sole discretion" appears akin to the "magic words" setting forth Defendants' complete discretion to determine the amount of Schiff's incentive compensation, see Culver, 1995 WL 422203, at *3, this provision must be read in tandem with the 20% incentive compensation provision.  Schiff suggests these clauses can plausibly be read to give Defendants "sole discretion" to make "computations and determinations" to calculate the managing member's incentive compensation.  But according to Schiff, Defendants must then designate 20% of that amount as Schiff's incentive compensation.  Stated differently, Defendants have discretion to calculate the total size of the pot (i.e., 10th Lane Partners' incentive compensation),

but they must always allocate 20% of that pot to Schiff.  Defendants take a different tack and argue that they are vested with "sole discretion" to make all "computations and determinations" with regard to both 10th Lane Partners' incentive compensation <u>and</u> Schiff's portion of that sum.

To the extent the terms "computations and determinations" include Defendants' ability to reduce Schiff's incentive compensation for "fees and expenses," (AC ¶ 84), it is ambiguous.  Therefore, this Court cannot say that Schiff has failed to state a claim for breach of contract.  <u>See, e.g.</u>, <u>Longhi v. Lombard Risk Sys., Inc.</u>, 2019 WL 4805735, at *6 (S.D.N.Y. Sept. 30, 2019) ("Retaining some discretion regarding the amount and distribution of bonuses does not, on its own, justify dismissal of a bonus claim." (citing <u>Lam v. Am. Express Co.</u>, 265 F. Supp. 2d 225, 238 (S.D.N.Y. 2003))); <u>see also</u> <u>Canet v. Gooch Ware Travelstead,</u> 917 F. Supp. 969, 985 (E.D.N.Y. 1996) (discretion to determine amount of bonus did not equate with discretion whether to pay a bonus).

Moreover, even assuming that the contract vested Defendants with complete discretion to determine the <u>amount</u> of Schiff's incentive compensation, this Court cannot conclude that the phrase "computations and determinations" encompasses the requirement of a release.  The contract allows for "[a]ny changes, amendments or modifications to the incentive compensation plan . . . in ZM's sole discretion."  (Employment Agreement, at 2.)  But it explicitly requires that these changes "apply equally to similarly situated ZM employees." (Employment Agreement, at 2.)  Construing all reasonable inferences in Schiff's favor, the Amended Complaint indicates that only Schiff was asked to execute a release as a condition of payment.  (AC ¶¶ 12, 85.)  Discovery may reveal that Defendants retained this discretion and that there were no "similarly situated ZM employees."  But at this stage, resolving all contractual

ambiguities in favor of the plaintiff, Schiff states a breach of contract claim against 10th Lane

Partners.  See Subaru Distribs. Corp., 425 F.3d at 122.

    c.   Breach of the Implied Covenant

        "Implicit in all contracts is a covenant of good faith and fair dealing in the course

of contract performance."  Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995).

This doctrine prohibits parties from doing "anything which will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract."  Kirke La Shelle Co. v.

Paul Armstrong Co., 188 N.E. 163, 167 (N.Y. 1933).  However, this implied covenant "can only

impose an obligation consistent with other mutually agreed upon terms in the contract" and

cannot add a substantive provision to the contract.  Nat'l Gear & Piston, Inc. v. Cummins Power

Sys., LLC, 861 F. Supp. 2d 344, 364 (S.D.N.Y. 2012) (quotation marks omitted).  Such claims

"survive[ ] a motion to dismiss where the implied promise protects either the contract's central

purpose or a party's right under a specific contractual provision."  Ret. Bd. of Policemen's

Annuity & Ben. Fund of City of Chicago v. Bank of N.Y. Mellon, 2014 WL 3858469, at *5

(S.D.N.Y. July 30, 2014).

        The Amended Complaint alleges that Defendants breached the implied covenant

in the Employment Agreement by:

> [K]nowingly and willfully causing and directing 10[th] Lane Partners
> and 10[th] Lane Finance to (a) engage in new investments after
> expiration of the Investment Period; (b) delay the sale of investment
> assets of 10[th] Lane Finance; (c) sell the investment assets of 10[th]
> Lane Finance at a reduced price in a self-dealing transaction; (d)
> delay collection of proceeds of the Sale; (e) delay distribution of the
> incentive compensation; (f) refuse to provide and/or delay providing
> information to Plaintiff; and (g) attempt to charge excessive
> professional fees and/or improperly attribute such fees to Plaintiff.

(AC ¶ 102.)[4]

As an initial matter, the implied covenant claims enumerated (e) through (g) are duplicative of Schiff's express contract claims and fail as a matter of law.  See Cary Oil Co. v. MG Ref. & Mktg., Inc., 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000).  An "implied-covenant [contractual] claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract."  EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co., 309 F. Supp. 3d 89, 93 (S.D.N.Y. 2018) (alteration in original) (quotation marks omitted).  Claims (e) and (g) are premised on the same set of facts as those underlying his breach of contract claim: that is, Schiff's incentive compensation was reduced and ultimately withheld.  And the relief Schiff is seeking for claim (f) regarding withholding information is "intrinsically tied to the damages allegedly resulting from the breach of contract."  EFG Bank AG, 309 F. Supp. 3d at 93 (quotation marks omitted); see also Alter v. Bogoricin, 1997 WL 691332, at *8 (S.D.N.Y. Nov. 6, 1997) ("The damages plaintiff seeks as a result of defendants' alleged failure to turn over financial information is identical to the damages he seeks for the alleged breach of contract—in both instances, unpaid compensation.").

With respect to the implied covenant claims enumerated (a) through (d), Defendants argue these are express breaches of the LLC Agreement, not the Employment Agreement.  While the value of Schiff's incentive compensation depends on 10th Lane Partners' receipt of distributions under the LLC Agreement, Schiff cannot expand a breach of the LLC

---

[4]     Schiff's allegation that Defendants breached the implied covenant of good faith and fair dealing in connection with the Confidentiality Agreement does not state a cognizable claim and is dismissed.  The Confidentiality Agreement will be addressed below in relation to Schiff's request for a declaratory judgment.

Agreement to encompass an implied breach of the Employment Agreement.  See Ferguson v. Lion Holding, Inc., 478 F. Supp. 2d 455, 479 (S.D.N.Y. 2007) ("[T]he implied covenant of good faith and fair dealing is not designed to enlarge or create new substantive rights between parties.").  Schiff cites Living Media India Private, Ltd. v. Bombay Holding Corp., 1989 WL 19138, at *1 (S.D.N.Y. Feb. 27, 1989), for the proposition that an express breach of one agreement can also be a breach of the covenant of good faith and fair dealing implied in another agreement.  (See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss and in Supp. of Pl.'s Cross-Mot. to Am., ECF No. 54 ("Pl.'s Opp'n"), at 11.)  His reliance on Living Media is misplaced because that decision concerned only whether a defendant's counterclaim should be stayed pending arbitration.  And Schiff is not without recourse because these allegations are almost identical to his breach of contract claims under the LLC Agreement in the second cause of action and his tortious interference claim in the third cause of action.  Therefore, his claim for a breach of the implied covenant of good faith and fair dealing is dismissed.

     d.  Tortious Interference

        A claim for tortious interference with a contract requires: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (quotation marks omitted). Additionally, the "general rule is that a claim for tortious interference will lie only against a stranger who improperly interferes with a contract between two contracting parties." IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 407 (S.D.N.Y. 2009).

Here, Defendants argue that Schiff's tortious interference claims fail because neither 10th Lane Partners nor Morgan are "stranger[s]" to the contract.  First, as the successor in interest to ZM Equity, Schiff concedes that 10th Lane Partners cannot tortiously interfere with the very contract it assumed.  (Pl.'s Opp'n, at 20 n.9.)  Second, Morgan was not a stranger to the contract because he executed the Employment Agreement on behalf of ZM Equity.  (AC ¶ 33; Employment Agreement, at 3.)  And "under New York law, a corporate officer cannot be held individually liable for alleged tortious interference by his or her corporate employer." Houbigant, Inc. v. Dev. Specialists, Inc., 229 F. Supp. 2d 208, 222 (S.D.N.Y. 2002).

However, there is a narrow exception to this rule that permits a "corporate director or officer [to] be held liable for tortious interference with contract where he or she acts for [ ] personal, rather than the corporate interests." Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey, 894 F. Supp. 2d 288, 338 (S.D.N.Y. 2012) (second alteration in original) (quotation marks omitted).  This is governed by an "enhanced pleading standard" and requires a plaintiff to "allege that the acts complained of, whether or not beyond the scope of the defendant's corporate authority, were performed with malice and were calculated to impair the plaintiff's business for the personal profit of the defendant." Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp., 744 N.Y.S.2d 384, 390–91 (App. Div. 2002).

Schiff alleges that Morgan acted in his "own selfish economic interests, which were adverse to the interests of ZM Equity or [CLP]."  (AC ¶ 129).  But Schiff undermines his own allegation by admitting that Morgan "owned and controlled" both companies, as well as the successor entity 10th Lane Partners.  (AC ¶¶ 2, 20–21.)  Thus, it is unclear whether Morgan acted outside the scope of his employment.  Moreover, Schiff never alleges that Morgan's actions "were performed with malice" against him. Joan Hansen, 744 N.Y.S.2d at 391.  His conclusory

allegations, without more, are insufficient to satisfy the heightened pleading standard and are therefore dismissed.  See, e.g., Scuderi v. Springer, 2004 WL 2711048, at *2 (S.D.N.Y. Nov. 29, 2004) (dismissing tortious interference claim based on conclusory allegations that defendants acted "outside the scope of their authority as officers" and personally received compensation); Bonanni v. Straight Arrow Publishers, Inc., 520 N.Y.S.2d 7, 9 (App. Div. 1987) ("Failure to plead in nonconclusory language facts establishing all the elements of a wrongful and intentional interference in the contractual relationship requires dismissal of the action.").

III.    LLC Agreement

     a.  Direct or Derivative Claims

       Schiff alleges that 10th Lane Partners breached the LLC Agreement and its implied covenant of good faith and fair dealing.  The LLC Agreement provides that 10th Lane Finance is governed by Delaware law.  (LLC Agreement, at D-6 ¶ 18.)  As a threshold issue, Defendants argue that Schiff states derivative claims, although they are pled as direct claims, and that the Amended Complaint fails to meet the pleading standards for derivative claims under Delaware law.  (Defs.' Mem., at 12.)  Schiff counters that his claims are direct because he alleges an injury different from any suffered by the 10th Lane Finance members, namely his contractual right to be paid incentive compensation.  (Pl.'s Opp'n, at 13–14.)

       Determining whether a claim is derivative or direct "must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).  Additionally, "to prove that a claim is direct, a plaintiff must demonstrate that the duty breached was owed to the stockholder and that he or she

can prevail without showing an injury to the corporation." El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff, 152 A.3d 1248, 1260 (Del. 2016) (quotation marks omitted).  Although the standard under Tooley references corporations, the same principles apply to limited liability companies.  See Kelly v. Blum, 2010 WL 629850, at *9 (Del. Ch. Feb. 24, 2010); see also Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack, 2017 WL 1215753, at *5 (S.D.N.Y. Mar. 31, 2017); Amusement Indus., Inc. v. Stern, 2010 WL 2976199, at *5 (S.D.N.Y. July 26, 2010).

To support his claim that 10th Lane Partners breached the LLC Agreement, Schiff largely relies on the same string of allegations discussed above in the breach of the Employment Agreement section.  (Compare, e.g., AC ¶ 102 (alleging ZM Equity and CLP breached the Employment Agreement by "knowingly and willfully causing and directing 10th Lane Partners and 10th Lane Finance to (a) engage in new investments after expiration of the Investment Period), with AC ¶ 120 (alleging that 10th Lane Partners breached the LLC Agreement "by causing and directing the following acts and omissions by 10th Lane Finance: (a) engaging in new investments after expiration of the Investment Period").)  His cut-and-paste strategy is unhelpful in analyzing these claims, especially since only some have any bearing on the LLC Agreement.

Focusing on the relevant allegations, claims (a) through (d), and (g), are premised on harms to 10th Lane Finance as a company, not Schiff.  For example, Schiff alleges that extending 10th Lane Finance's Investment Period caused a "significant decline in the value of the [company's] investment assets."  (AC ¶ 8.)  The Amended Complaint further alleges that the investment assets were eventually sold in a "self-dealing" transaction to "the detriment of [Schiff] and the other independent investors of 10th Lane Finance."  (AC ¶ 9 (emphasis added).)

19

Similarly, 10th Lane Partners' delay in collecting proceeds of that transaction, and the "excessive" professional fees charged to 10th Lane Finance, "dilute[ed] the value of the proceeds due to outside investors." (AC ¶¶ 10–11.) In essence, Schiff is alleging that 10th Lane Partners caused 10th Lane Finance to be worth less because of mismanagement of the fund, thereby harming Schiff indirectly. But these injuries arose only because of his investment interest as a member of 10th Lane Finance. See Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988)) ("A claim of mismanagement . . . represents a direct wrong to the corporation that is indirectly experienced by all shareholders."); accord Stephenson v. Citco Grp. Ltd., 700 F. Supp. 2d 599, 610 (S.D.N.Y. 2010) ("A claim for deficient management or administration of a fund is a paradigmatic derivative claim." (quotation marks omitted)). Accordingly, Schiff has not adequately "explained how he would be harmed directly by these alleged breaches of [contractual] duties independent from harm to [10th Lane Finance]." Dietrichson v. Knott, 2017 WL 1400552, at *4 (Del. Ch. Apr. 19, 2017).

To circumvent this obstacle, Schiff insists that his injuries are direct because "a suit by a party to a commercial contract to enforce its own contractual rights is not a derivative action under Delaware law." El Paso Pipeline, 152 A.3d at 1259 (quoting NAF Holdings, LLC v. Li & Fung (Trading) Ltd., 118 A.3d 175, 182 (Del. 2015)). But in El Paso Pipeline, the Supreme Court of Delaware rejected the argument that Schiff advances here. Indeed, the court held that its prior decision in NAF Holdings "does not support the proposition that any claim sounding in contract is direct by default, irrespective of Tooley." El Paso Pipeline, 152 A.3d at 1259. Like the limited partnership at issue in El Paso Pipeline, the LLC Agreement is not a commercial contract. El Paso Pipeline, 152 A.3d at 1260. And critically, Schiff's "contractual rights" are derived from the Employment Agreement with ZM Equity, not the LLC Agreement.

20

Although Schiff is a member of 10th Lane Finance, and therefore a party to the LLC Agreement, that status does not "enable him to litigate directly every claim arising from the [LLC Agreement]." El Paso Pipeline, 152 A.3d at 1259.

Moreover, under the second prong of Tooley, any recovery related to the dilution of assets would flow first to 10th Lane Finance. Members like Schiff would recover "pro rata in proportion with their ownership." Feldman v. Cutaia, 951 A.2d 727, 733 (Del. 2008). Again, although Schiff would also receive a portion of 10th Lane Partners' distribution in the form of incentive compensation, that entitlement arises only under the Employment Agreement. Stated differently, any recovery that Schiff receives in the form of incentive compensation depends on 10th Lane Finance recovering investment assets, and subsequently making a distribution. Thus, claims (a) through (d), as well as (g), are derivative.[5]

Under Delaware law, "a member [of an LLC] may only pursue claims derivatively on behalf of the company if the member can demonstrate that [1] 'managers or members with authority to do so have refused to bring the action or [2] if an effort to cause those managers or members to bring the action is not likely to succeed.'" Stone & Paper Inv'rs, LLC v. Blanch, 2019 WL 2374005, at *4 (Del. Ch. May 31, 2019) (quoting 6 Del. C. § 18-1001). However, because Schiff did not make a demand or plead demand futility in his Amended Complaint, his derivative claims for breach of contract are dismissed. See 6 Del. C. § 18-1003; Dietrichson, 2017 WL 1400552, at *5. Schiff's claim for breach of the implied covenant of good faith and fair dealing under the LLC Agreement parallels his breach of contract claim and is

---

[5]    The remaining claims allege breaches of the Employment Agreement, not the LLC Agreement. For example, in claim (e), Schiff contends that 10th Lane Partners breached § 6.1 of the LLC Agreement by delaying distributions to members of 10th Lane Finance. (AC ¶¶ 72, 120.) But the recovery he seeks is the 20% incentive compensation under the Employment Agreement, not his own distribution under the LLC Agreement. Similarly, claims (f) and (h) are focused on incentive compensation. (AC ¶¶ 73–85, 120.) These allegations are part and parcel of the breach of Employment Agreement claim.

similarly dismissed.  See Dietrichson, 2017 WL 1400552, at *5 n.31.

    b.  Tortious Interference

        "Under Delaware law, the elements of a claim for tortious interference with a contract are: (1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."  Bhole, Inc. v. Shore Invs., Inc., 67 A.3d 444, 453 (Del. 2013) (quotation marks omitted).  However, "[i]t is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract."  Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 884 (Del. Ch. 2009).

        Here, Schiff's tortious interference claims under the fourth cause of action are dismissed for failure to state a claim.  Morgan is: (1) a member of 10th Lane Finance; (2) the alleged beneficial owner of 10th Lane Partners; and (3) a signatory of the LLC Agreement. Therefore, he is not a stranger to the LLC Agreement and Schiff cannot hold him liable for a tortious interference claim.  See, e.g., Tenneco Auto., Inc. v. El Paso Corp., 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007) (noting that tortious interference claim requires defendant "be a stranger to both the contract and the business relationship giving rise to and underpinning the contract" (quotation marks omitted)).  Further, the allegations that Morgan exceeded the scope of his agency are conclusory and are dismissed.  See Kuroda, L.L.C., 971 A.2d at 885 (dismissing tortious interference claim because the complaint was "devoid of any factual allegations that lead to a reasonable inference that [the defendant officers] acted outside the scope of their authority"); Fisk Ventures, LLC v. Segal, 2008 WL 1961156, at *12 n.56 (Del. Ch. May 7, 2008).  Finally, because the Amended Complaint does not allege any independent tortious conduct by CLP, that claim too is dismissed.

    c.  <u>Motion to Amend and the Role of 10th Lane Finance</u>

       Schiff seeks to amend the Amended Complaint to allege demand futility.  (ECF No. 53.)  Although Rule 15 of the Federal Rules of Civil Procedure exhorts courts to "freely give leave when justice so requires," <u>see</u> Fed. R. Civ. P. 15(a)(2), it is well-settled that a court has discretion to deny leave to amend even under this liberal standard if, for example, the amendment would be futile, if the movant acted with undue delay, bad faith, or a dilatory motive, or if granting leave would result in prejudice to the opposing party, <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  Additionally, Rule 21 of the Federal Rules of Civil Procedure provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  Fed. R. Civ. P. 21.  "Motions under Rule 21 are governed by the same standard as a motion to amend under Rule 15."  <u>LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.</u>, 287 F.R.D. 230, 236 (S.D.N.Y. 2012).

       Defendants' threadbare allegations of Schiff's undue delay, bad faith, and dilatory motive are unpersuasive given the early stage of this litigation.  See <u>Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC</u>, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."); <u>Cresci v. Mohawk Valley Cmty. Coll.</u>, 693 F. App'x 21, 25 (2d Cir. 2017) (summary order) ("The proper time for a plaintiff to move to amend the complaint is when the plaintiff learns from the District Court in what respect the complaint is deficient.").  Therefore, this Court focuses on the futility analysis.

       An amendment is futile "if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  <u>Lucente v. Int'l Bus. Machs. Corp.</u>, 310 F.3d 243, 258 (2d Cir. 2002).  A court should deny a motion to amend if it does not contain "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal,

556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  Additionally, "[i]f a proposed amendment

adds a claim and party over which the Court lacks subject matter jurisdiction, the amendment

would be futile." Ricciardi v. Kone, Inc., 215 F.R.D. 455, 456 (E.D.N.Y. 2003); Chan v. Reno,

916 F. Supp. 1289, 1302 (S.D.N.Y. 1996).

      Both parties fail to address subject matter jurisdiction and the role of non-party

10th Lane Finance to any proposed derivative claim.  "If subject matter jurisdiction is lacking and

no party has called the matter to the court's attention, the court has the duty to dismiss the action

sua sponte." Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont, 565 F.3d 56,

62 (2d Cir. 2009).  This case rests on diversity jurisdiction, which requires that "all of the

adverse parties in a suit . . . be completely diverse with regard to citizenship." Handelsman v.

Bedford Vill. Assocs. Ltd. P'ship, 213 F.3d 48, 51 (2d Cir. 2000) (alteration in original)

(quotation marks omitted).  An LLC has the citizenship of all its members. See Bayerische

Landesbank, N.Y. Branch v. Aladdin Capital Mgmt., 692 F.3d 42, 49 (2d Cir. 2012).

      Moreover, Rule 19 of the Federal Rules of Civil Procedure "sets forth a two-step

test for determining whether the court must dismiss an action for failure to join an indispensable

party.  First, the court must determine whether an absent party belongs in the suit, i.e., whether

the party qualifies as a 'necessary' party under Rule 19(a)." Viacom Int'l, Inc. v. Kearney, 212

F.3d 721, 724 (2d Cir. 2000).  Rule 19(a) provides, in relevant part, that an absent party is a

necessary party if it "claims an interest relating to the subject of the action and is so situated that

disposing of the action in the person's absence may . . . as a practical matter impair or impede the

person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i).  Second, if "the court

makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the

absent party is not feasible for jurisdictional . . . reasons, the court must . . . determine whether the party is 'indispensable'" under Rule 19(b).  Viacom, 212 F.3d at 725 (citations omitted).

   Here, allowing Schiff to amend his complaint to plead demand futility would likely destroy subject matter jurisdiction.  First, since Schiff seeks to pursue a derivative action on behalf of non-party 10th Lane Finance, "the LLC itself is a necessary party under Rule 19 of the Federal Rules of Civil Procedure."  Atanasio v. O'Neill, 235 F. Supp. 3d 422, 425 (E.D.N.Y. 2017); Bartfield v. Murphy, 578 F. Supp. 2d 638, 650 (S.D.N.Y. 2008) (finding that a LLC was a necessary party to "derivative claims raised on its behalf" under Rule 19(a)); cf. HB Gen. Corp. v. Manchester Partners, L.P., 95 F.3d 1185, 1190 (3d Cir. 1996) ("We agree with the district court that, pursuant to Rule 19(a), this Partnership should be joined if feasible.").  But as an LLC with members who are citizens of Florida and New York, among other states, 10th Lane Finance has citizenship in both states.  Thus, since 10th Lane Finance shares citizenship with Schiff and Morgan, the joinder of 10th Lane Finance as a party would destroy complete diversity. Moreover, 10th Lane Finance may be an indispensable party under Rule 19(b).  See, e.g., Bartfield, 578 F. Supp. 2d at 650 (holding that LLC was indispensable party in derivative action); Mazzio v. Kane, 2014 WL 2866040, at *5 (E.D.N.Y. June 24, 2014) (finding that plaintiffs "cannot bring derivative claims on behalf of [the LLC] without joining [the LLC] as a party to the suit").  Therefore, since Schiff's claims are derivative, any amendment would be likely be futile.

   However, since this issue was not previously addressed, Schiff shall submit supplemental briefing to this Court—in three pages or less—detailing his position regarding the joinder of 10th Lane Finance and whether this case is ripe for remand to the New York State

Supreme Court.  See 28 U.S.C. § 1447(e).  Defendants shall respond in three pages or less.[6]

IV.    Confidentiality Agreement

Schiff is also seeking a declaratory judgment against 10th Lane Partners releasing

him from his Confidentiality Agreement so that he can disclose his track record to potential

employers and clients.  (AC ¶¶ 139–44.)  Defendants counter that there is no actual dispute

because the Confidentiality Agreement is enforceable and Schiff's alleged harms are speculative.

(Defs.' Mem., at 21–24.)  New York substantive law governs this issue.  (See Confidentiality

Agreement, at 6 (designating New York law and venue).)

"In a case of actual controversy within its jurisdiction . . . any court of the United

States . . . may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The

Second Circuit has directed district courts to ask two questions when determining whether to

entertain an action seeking a declaratory judgment: "(1) whether the judgment will serve a useful

purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would

finalize the controversy and offer relief from uncertainty."  Duane Reade, Inc. v. St. Paul Fire &

Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

As a threshold issue, this Court finds that the Confidentiality Agreement's non-

solicitation provision has expired.  The non-solicitation clause provides that "[w]ithout the prior

written consent of the Company," any employee shall not "directly or indirectly . . . during

his/her employment with the Company and for twelve months thereafter, in any manner, directly

---

[6]    Schiff provided an analysis—albeit brief—of how pleading demand futility would cure deficiencies in his Amended Complaint.  (Pl.'s Opp'n, at 15.)  However, he gives no indication that pleading the second cause of action against Morgan or pleading the third cause of action against CLP would cure the Amended Complaint's defects. Therefore, without more, Schiff's motion to amend to add these two additional claims is denied as futile.  See F5 Capital v. Pappas, 856 F.3d 61, 89 (2d Cir. 2017) (upholding district court's finding that amendment would be futile when plaintiff failed to "explain how it proposed to amend the complaint to cure its defects").

or indirectly" solicit, inter alios, various individuals associated with the Company for

employment or business relationships.  (Confidentiality Agreement ¶ 2.)  Thus, the non-

solicitation agreement expired in February 2016—one year after Schiff resigned, (AC ¶ 47)—

and any declaration concerning its non-enforceability is moot.

        Regarding the other provisions of the Confidentiality Agreement, New York

courts use a standard of reasonableness in judging the validity of post-employment restrictive

covenants.  See BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999).  The New

York Court of Appeals has held that a restraint is reasonable "only if it: (1) is no greater than is

required for the protection of the legitimate interest of the employer, (2) does not impose undue

hardship on the employee, and (3) is not injurious to the public."  BDO Seidman, 712 N.E.2d at

1223; accord Oliver Wyman, Inc. v. Eielson, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017).

Furthermore, restrictive covenants will be enforced only if reasonably limited in scope and

duration, and only "to the extent necessary (1) to prevent an employee's solicitation or disclosure

of trade secrets, (2) to prevent an employee's release of confidential information regarding the

employer's customers, or (3) in those cases where the employee's services to the employer are

deemed special or unique."  Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir. 1999);

EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 312 (S.D.N.Y. 1999).

        This Court is concerned by the sheer breadth of the remaining provisions of the

Confidentiality Agreement.  Under that agreement, employees shall not, "whether before or

after" employment with the company, "disclose, furnish, make available or use any Confidential

Information, other than with the prior written consent of the Company."  (Confidentiality

Agreement ¶ 1(c).)  "Confidential Information" is defined as "non-public information . . . in any

form or medium . . . of or relating to the Company's business and its clients and each of their

affiliates, including, but not limited to" certain transactions, business strategies, client identities, investment methodologies, etc.  (Confidentiality Agreement ¶ 1(b).)

At first glance, the indefiniteness of this provision, as well as the lack of geographic scope, appear to make this agreement facially unreasonable.  See Am. Broad. Companies, Inc. v. Wolf, 420 N.E.2d 363, 367 (N.Y. 1981) ("[A]n otherwise valid covenant will not be enforced if it is unreasonable in time, space or scope or would operate in a harsh or oppressive manner."); accord Am. Inst. of Chem. Engineers v. Reber-Friel Co., 682 F.2d 382, 386 (2d Cir. 1982).  Nonetheless, this Court is mindful that this is not an explicit non-compete clause preventing Schiff from gaining employment in the financial services industry. Additionally, "the mere fact that . . . confidentiality agreements [are] not limited in duration does not necessarily make them ipso facto unenforceable."  Ashland Mgmt. Inc. v. Altair Investments NA, LLC, 869 N.Y.S.2d 465, 471 (App. Div. 2008), aff'd as modified, 925 N.E.2d 581 (2010).

However, this Court cannot discern from the record precisely which trade secrets or pieces confidential information are so important that they require indefinite protection.  While Schiff's attempt to release his "track record" is vague, this lack of specificity may be a byproduct of his caution—i.e., Schiff may not want to disclose too many details in fear of breaching the Confidentiality Agreement.  Indeed, a judicial decision here will help clarify and settle legal issues regarding the scope and enforceability of Schiff's Confidentiality Agreement.  And a judgment would finalize the controversy because, as Schiff alleges, Defendants communicated to him that he may be in breach of the Confidentiality Agreement.  (AC ¶¶ 88–89.)  Therefore, Defendants motion to dismiss is denied.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. All claims against ZM Equity are dismissed. The breach of contract claim under the Employment Agreement is dismissed as to all Defendants except 10th Lane Partners. The breach of contract claim under the LLC Agreement is dismissed in its entirety. However, Schiff shall submit supplemental briefing regarding the joinder of 10th Lane Finance by September 2, 2020. Defendants shall respond by September 8, 2020. Schiff's motion to amend is otherwise denied. The claims for breaches of the implied covenants of good faith and fair dealing and tortious interference are dismissed. Schiff's declaratory judgment claim regarding CLP's status as the alter ego of ZM Equity is dismissed. Schiff's declaratory judgment claim regarding the Confidentiality Agreement may proceed. The Clerk of Court is directed to terminate the motion pending at ECF No. 50.

Dated: August 27, 2020
      New York, New York

SO ORDERED:


WILLIAM H. PAULEY III
U.S.D.J.

29